Filed:  February 15, 2012

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 11-4216
(3:08-cr-00199-REP-1)

———————

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

     v.

JAMES E. VENABLE, a/k/a James Eugene Venable,

          Defendant - Appellant.

———————

O R D E R

———————

The Court amends its opinion filed January 18, 2012,
as follows:

On page 2, attorney information section, lines 3-5,
the name of "Brandon M. Santos, Special Assistant United States
Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond,
Virginia" is deleted.

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

   *Plaintiff-Appellee,*

v.

JAMES E. VENABLE, a/k/a James
Eugene Venable,

   *Defendant-Appellant.*

No. 11-4216

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, Senior District Judge.
(3:08-cr-00199-REP-1)

Argued: December 9, 2011

Decided: January 18, 2012

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Niemeyer and Judge King joined.

## COUNSEL

**ARGUED:** Patrick Risdon Hanes, WILLIAMS MULLEN, Richmond, Virginia, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Joseph R. Pope,

WILLIAMS MULLEN, Richmond, Virginia, for Appellant.
Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

## OPINION

DUNCAN, Circuit Judge:

Appellant James Venable was indicted by the United States Attorney's Office for the Eastern District of Virginia ("United States Attorney's Office") on the charge of possessing a firearm while being a felon, in violation of 18 U.S.C. § 922(g)(1). Venable, an African American, moved to dismiss the indictment against him, claiming that the United States Attorney's Office selected him for prosecution under a federal-state law enforcement initiative known as Project Exile because of his race, in violation of the equal protection component of the Fifth Amendment's Due Process Clause. As part of the motion, Venable sought discovery into the criteria and procedures used by the government in deciding to prosecute him in federal court while two other individuals, both white, who were also felons in possession of the same firearms as him, were not. The district court concluded that Venable had failed to satisfy his rigorous burden to obtain discovery on his selective prosecution claim. On appeal, Venable requests that we reverse the district court's order denying his motion for discovery and remand this case for discovery and an evidentiary hearing. For the reasons that follow, we affirm.

I.

A.

We begin by reciting the relevant facts. We first set forth the events leading up to the arrests of Venable, and the two

individuals Venable claims are similarly situated to him, Gary Wayne Turner and Michele Lynn Zechman. Because Venable's selective prosecution claim (including his request for discovery in support of that claim) rests on the allegation that Turner and Zechman, who were not prosecuted in federal court, are similarly situated to him, we next describe the facts pertaining to Turner's and Zechman's prosecutions in state court on the one hand, and Venable's prosecution in federal court on the other.

1.

On January 8, 2008, Turner and Zechman burglarized a home in Campbell County, Virginia, and stole eleven firearms. For Turner's role in the burglary and larceny of the firearms, Campbell County authorities sought to indict him on January 24, 2008, on the following state law charges: (1) statutory burglary, in violation of Virginia Code § 18.2-91; (2) grand larceny, in violation of Virginia Code § 18.2-95; and (3) possession of a firearm by a felon, in violation of Virginia Code § 18.2-308.2.

On January 28, 2008, Captain L.T. Guthrie from the Campbell County Sherriff's Office contacted Richmond Police Detectives Daniel O'Connell and Jack P. Larry to enlist the Richmond Police Department's assistance in arresting Turner pursuant to arrest warrants issued for the burglary. Captain Guthrie and Detectives O'Connell and Larry responded to Turner's residence and arrested him. After he was taken into custody, the three officers interviewed Turner about his involvement with the burglary. Turner cooperated with the officers, implicated himself in the burglary, and agreed to take them to the location where he had sold eight of the firearms. Turner directed the officers to the residence of an African American male named "James."

While Captain Guthrie remained with Turner, Detectives O'Connell and Larry knocked on the door of the house where

"James" lived. An African American male, later identified as Venable, opened the door. The detectives advised Venable that they were aware that he was in possession of stolen firearms. After Venable confirmed that the detectives were not going to arrest him for possession of stolen firearms, he cooperated with the Detectives and agreed to relinquish the firearms. At that time, the police were not aware of Venable's felon status, nor did they charge or arrest him.

The next day, January 29, 2008, Campbell County authorities charged Zechman with the same three state law offenses as Turner. At the time of the offense, Turner and Zechman resided together in Richmond at the same address. That day, Detectives O'Connell and Larry returned to Turner's and Zechman's residence to arrest Zechman on those charges. As the detectives spoke with Zechman, Venable exited a vehicle and began to approach the detectives and Zechman. The detectives cut him off before he reached the side of the residence where Zechman was standing, at which point Venable began yelling; Venable angrily demanded to know who told the police he had purchased the firearms. The detectives informed Venable that he needed to calm down, but Venable continued to be vocally hostile. At one point, Venable commented that he had just left the penitentiary, prompting Detective O'Connell to relate to him that the officers had given him a break the previous night if he was a convicted felon. Venable responded that his felon status was beside the point. Shortly thereafter, Venable got back into his car and left Zechman's residence.

After arresting Zechman, the detectives checked Venable's criminal history, noted that he had prior felony convictions, and obtained a search warrant for Venable's residence (based on his criminal record and a box of .45 caliber ammunition that the detectives had seen inside his house the previous night). The detectives returned to Venable's residence, and he told them to leave unless they had a warrant. The detectives

showed Venable the warrant, recovered the ammunition, and arrested him.

### 2.

State prosecutors in Campbell County, located in the Western District of Virginia, obtained indictments against Turner and Zechman on April 30, 2008, on charges of statutory burglary, grand larceny, and possession of a firearm by a convicted felon.[1] Both eventually pleaded guilty to the charges, Zechman on August 7, 2008, and Turner on November 4, 2009. On December 18, 2008, Zechman was sentenced to five years for statutory burglary, two years for grand larceny, and one year for possession of a firearm by a convicted felon. All three of Zechman's sentences were suspended on condition that she complete a rehabilitation program. In addition, Zechman was ordered to be on good behavior for a period of ten years and to comply with supervised probation for a period of three years. On January 28, 2010, Turner was sentenced to five years of incarceration with five years suspended for statutory burglary, five years of incarceration with five years suspended for grand larceny, and five years of incarceration for possession of a firearm by a convicted felon. Turner is currently serving his sentence with the Virginia Department of Corrections. Turner was also sentenced to supervised probation following his release.

### 3.

On January 29, 2008, the Commonwealth Attorney's Office for the City of Richmond ("Richmond Commonwealth Attorney's Office") indicted Venable on the charge of possession of a firearm by a felon, in violation of Virginia Code § 18.2-308.2. Venable was to be tried in the Circuit Court for the City of Richmond. Under a program commonly referred

---

[1]Campbell County authorities expressed that they wanted to vindicate the rights of the owner of the firearms.

to as "Project Exile," however, the Richmond Commonwealth Attorney's Office presented Venable's case to the Richmond Division of the United States Attorney's Office for review and possible federal prosecution. On April 17, 2008, a criminal complaint was filed in the Clerk's Office of the United States District Court for the Eastern District of Virginia, Richmond Division, charging Venable with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[2] The next day, April 18, 2008, the state charge against Venable was nolle prossed in the Circuit Court for the City of Richmond. On April 21, 2008, the United States Attorney's office filed an indictment in the Eastern District of Virginia, charging Venable with violating § 922(g)(1). Venable was placed in federal custody on April 22, 2008.

Project Exile is a federal-state law enforcement initiative jointly run by the Richmond Commonwealth Attorney's Office and the United States Attorney's Office.[3] The project was implemented in Richmond in 1997 with the goal of reducing Richmond's high rates of violent crime by prosecuting firearm-related crimes federally whenever possible. Project Exile now targets the Richmond, Virginia metropolitan area, including the city of Richmond and Chesterfield and Henrico counties. It specifically targets convicted felons who possess guns. Under Project Exile, local police officers are encouraged to contact a federal agent whenever they encounter a gun in performing their duties, and, together with the federal agent, to determine whether federal law has been violated. In those cases in which the conduct alleged also constitutes a federal crime, local law enforcement officials and the

---

[2]Section 922(g) lists various categories of individuals for whom it is unlawful to, inter alia, "possess in or affecting commerce, any firearm or ammunition." The category under (g)(1) is any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."

[3]Project Exile also involves the Bureau of Alcohol, Tobacco, and Firearms; the Federal Bureau of Investigation; the Richmond Police Department, and the Virginia State Police.

Richmond Commonwealth Attorney's Office refer the matter to the United States Attorney's Office for review. Following that review, the United States Attorney's Office decides which cases to accept for federal prosecution. If the United States Attorney's Office obtains an indictment charging the defendant with federal firearm-related crimes, then the Richmond Commonwealth Attorney's Office drops the state charges, and the case proceeds in federal court. The Richmond Commonwealth Attorney's Office provides a prosecutor to assist with the federal prosecution.

B.

1.

Before his trial in federal district court, Venable filed numerous pro se motions seeking to dismiss his indictment, including a "Motion to Dismiss based on Racial Discrimination" filed on August 6, 2008, which the district court denied on August 8, 2008. On August 11, 2008, a jury found Venable guilty of violating § 922(g)(1). The district court sentenced Venable to sixty months of incarceration, a downward variance from the Guidelines range, and three years of supervised release.

Venable appealed his conviction to this court, claiming that the district court violated his Sixth Amendment right to counsel in not obtaining a voluntary and knowing waiver and forcing him to proceed pro se. *United States v. Venable*, 373 F. App'x. 402, 403 (4th Cir. 2010). We agreed, reversed his conviction and remanded the case to the district court. *Id.* at 407. The United States elected to retry Venable.

Venable moved to dismiss the indictment, claiming that the United States Attorney's Office selected him for prosecution under the Project Exile program because of his race in violation of the equal protection component of the Fifth Amendment's Due Process Clause. Venable also filed a motion for

discovery respecting Project Exile and the decision to prosecute him under its auspices. In support of his motions for dismissal and discovery, Venable argued the following: (1) Turner and Zechman, who stole the firearms and then possessed and sold them in the City of Richmond, were not prosecuted federally because they are white; and (2) a grossly disproportionate number of African American defendants as compared with white defendants were prosecuted for firearms offenses in the Richmond Division of the United States Attorney's Office in the years preceding Venable's prosecution.

On October 5, 2010, the district court held a hearing during which Venable presented evidence in the form of testimony and exhibits in order to satisfy his burden to gain discovery into the government's records. He offered printouts from the Circuit Court of Campbell County detailing the charges and dispositions of the charges against Turner and Zechman.

Venable further offered a printout of Turner's criminal history in the Circuit Court of the City of Richmond. The bulk of Venable's documentary evidence was contained in a spreadsheet he designated, "Compilation of District Court Records 2005 to 2007" (the "Spreadsheet"). The Spreadsheet has seven relevant columns: Case Number, Name of the Defendant, Charges, United States Code Section, Disposition, Counsel, and Race of the Defendant. Pamela Bishop, a paralegal investigator with the Office of the Federal Public Defender in Richmond, Virginia, testified in the district court that the 178-page Spreadsheet compiles all of the publicly available federal cases that had been filed in the Eastern District of Virginia, Richmond Division, for 2005, 2006, and 2007. From this information, Bishop determined the percentage of African Americans charged with violating § 922(g)—or § 924(a), which provides various penalties for violating § 922(g)—by the Richmond Division of the United States Attorney's Office by year. For 2005, of the 114 individuals charged, 106 were African American, resulting in a percentage of 92.98 percent. For 2006, of the 112 individuals

charged, 98 were African American, resulting in a percentage of 87.5 percent. Finally, for 2007, of the 90 individuals charged, 70 were African American, resulting in a percentage of 77.78 percent. For the three combined years, of the 316 individuals charged, 274 were African American, resulting in an overall percentage of 86.71 percent.

Finally, Venable introduced statistics compiled from the Circuit Courts of Chesterfield, Hanover, and Henrico counties, Virginia, and the city of Richmond, Virginia detailing the number of African American, white, and American Indian defendants who were charged with violating Va. Code § 18.2-308.2, the state law provision prohibiting felons from carrying firearms. The statistics detailed the numbers of defendants who had their charges dismissed, who were found guilty, who had their charges nolle prossed, and who were found not guilty, all in the years 2005 through 2007. The Supreme Court of Virginia compiled the information at the request of the Office of the Federal Public Defender. Venable offered the statistics as a representation of those white individuals who could have been prosecuted by the federal government in the Richmond Division of the United States Attorney's Office but were not.

Citing the defendant's rigorous burden in obtaining discovery from the government's records on its prosecutorial decisions, the government declined to present any evidence and rested on Venable's burden. However, it then put forth arguments in opposition to Venable's motion and discovery requests premised on what the district found to be "an understanding of Project Exile not supported by evidence in the record." J.A. 601. The government elected not to explain the criteria used by the United States Attorney's Office and the Richmond Commonwealth Attorney's Office in selecting those defendants to be prosecuted under Project Exile. The district court afforded the government more time to decide whether it would offer testimony or evidence about Project Exile, and specifically, how the government administers it, its

rationale, its workings, and the criteria employed for accepting and prosecuting cases under it. The government then filed a supplemental response to Venable's motion to dismiss in which it explained the origins, goal, and generalized organization and functioning of Project Exile. Although the government declined to discuss the specific factors considered in the decision to prosecute Venable, it asserted that a review of his case reveals that his prosecution complied with the charging policies found in the United States Attorneys' Manual.

2.

In ruling on Venable's motion to dismiss the indictment on grounds of selective prosecution, the district court began by noting that a prior Eastern District of Virginia decision had expressed concern that because there was little information regarding the specific process by which defendants are selected for prosecution under Project Exile, one could cast some doubt on the assertion that race played no role in selecting defendants for federal prosecution under the program. *See United States v. Jones*, 36 F. Supp. 2d 304 (E.D. Va. 1999). Here, the district court continued, it had provided every opportunity to the United States Attorney's Office to present evidence "respecting Project Exile, its processes, its rationale, how it is utilized, and the criteria used to select City of Richmond cases for federal prosecution. The Government, however, within its right, chose to rest on the contention that the defendant had not met his burden." J.A. 610. The district court continued:

> It would have been preferable to have had the Government make a fuller explanation about how generally cases are selected for inclusion in Project Exile and then are prosecuted in federal court. That is significantly so given the expressions of concerns in *Jones* and the significant percentage of Project Exile defendants who are African-American. But, the United States Attorney's Office obdurately declined

> to take that course. Hence, the motion must be decided on the existing record, which, unfortunately, leaves a considerable distaste because it is almost certain that the Government could have made a good affirmative showing had it not so woodenly embraced executive prerogative. That course did a considerable disservice to the record.

J.A. 610. In view of the record, the district court denied Venable's motion to dismiss the indictment, as well as his motion for discovery on his selective prosecution claim. Venable now appeals.

## II.

Venable argues that the district court erred by denying him discovery on his motion to dismiss the indictment against him on selective prosecution grounds. We review de novo a district court's disposition of a motion for discovery in support of a selective prosecution claim. *United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010).

A selective prosecution claim is an "assertion that the prosecutor had brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). The government ordinarily has wide latitude in deciding whether to prosecute. However, equal protection forbids basing the decision "on an unjustifiable standard such as race, religion or other arbitrary classification." *Id.* at 464 (internal quotations omitted).

The burden on a party seeking to dismiss an indictment on the basis of selective prosecution is high. "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary," demonstrating that the government was motivated by a discriminatory purpose to adopt a prosecutorial policy with a discriminatory effect. *Id.* at 465 (internal quota-

tions omitted). To make this showing, a defendant must "establish both (1) that similarly situated individuals of a different race were not prosecuted, and (2) "that the decision to prosecute was invidious or in bad faith." *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996) (internal citations and quotations omitted). Because discovery imposes high costs on the government, the standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal of the indictment; rather than presenting clear evidence, the "defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." *Id.* (quoting *Armstrong*, 517 U.S. at 470).

Thus, to obtain discovery, Venable must produce some evidence making a credible showing that (1) similarly situated individuals of a different race were not prosecuted; and (2) the decision to prosecute was invidious or in bad faith. *See Olvis*, 97 F.3d at 743. We consider each element in turn.

A.

Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them. *Olvis*, 97 F.3d at 744. "Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors." *Id.* Of particular significance here, the district court cannot only consider the other persons' "relative culpability," but must "take into account several factors that play important and legitimate roles in prosecutorial decisions." *Id.* Examples of such factors include: (1) a prosecutor's decision to offer immunity to an equally culpable defendant because that defendant may choose to cooperate and expose more criminal activity; (2) the strength of the evidence against a particular defendant; (3) the defendant's role in the crime; (4) whether the defendant is being prosecuted by state authorities; (5) the

defendant's candor and willingness to plead guilty; (6) the amount of resources required to convict a defendant; (7) the extent of prosecutorial resources; (8) the potential impact of a prosecution on related investigations and prosecutions; and (9) prosecutorial priorities for addressing specific types of illegal conduct. *Id.* Our analysis of these factors is not to be conducted in a mechanistic fashion, however, because "[m]aking decisions based on the myriad of potentially relevant factors and their permutations require the very professional judgment that is conferred upon and expected from prosecutors in discharging their responsibilities." *Id.* As such, we have rejected a "narrow approach to relevant factors to be considered when deciding whether persons are similarly situated for prosecutorial decisions." *Id.*

Applying the fact-focused *Olvis* test to the circumstances here, we conclude that Venable has failed to establish the first element of his selective prosecution claim; in other words, he has failed to produce any evidence making a credible showing that he was similarly situated to the white defendants (Turner and Zechman) who were not prosecuted federally. He can therefore not meet his burden of proof with respect to discriminatory effect.

It is largely dispositive here that different prosecutors in different jurisdictions under differing sovereigns made the different prosecutorial decisions as to Turner and Zechman on the one hand, and Venable on the other. This consideration is a permutation of the fourth *Olvis* factor: whether the defendant is being prosecuted by state authorities. Both Turner and Zechman were prosecuted by Campbell County authorities—geographically located in the Western District of Virginia, who expressed that they wanted to vindicate the rights of the owner of the firearms. Venable was originally charged by the Richmond Commonwealth Attorney's Office, geographically located in the Eastern District of Virginia, and was prosecuted federally only because the Richmond Commonwealth Attorney's Office presented his case to the United

States Attorney's Office pursuant to Project Exile, which solely applies to the Eastern District. Because Campbell County sits in the Western District, Turner's and Zechman's cases could therefore not have been so presented. Venable's argument that the United States Attorney's Office in Richmond was aware of Turner's and Zechman's violations misses the point: individuals can be "similarly situated" only if they were prosecuted by the same sovereign. Here, the United States Attorney's Office, which exercised its prosecutorial discretion to prosecute Venable federally pursuant to Project Exile, never had occasion to exercise its prosecutorial discretion with respect to Turner and Zechman under the auspices of that program. Although it may be true that the United States Attorney's Office could have determined that either Turner or Zechman, or both, should have been prosecuted federally for offenses they may have committed within the Eastern District of Virginia, that would have involved an exercise of discretion outside the ambit of Project Exile.

Turning briefly to the remaining *Olvis* factors, we note that the first *Olvis* factor—a prosecutor's decision to offer immunity—does not bear on this case: nothing in the record suggests that the United States Attorney's Office offered immunity to either Turner or Zechman in exchange for their cooperation in the case or to expose further criminal activity. With respect to the second factor, the strength of the evidence, Venable brought forth almost no information relevant to the case against Zechman. By contrast, the strength of the evidence against Venable and Turner appears to be in equipoise: the record strongly implicates both defendants with respect to the offenses with which they were charged. Thus, Venable and Turner, but not Venable and Zechman, appear to be similarly situated under the second factor. The third factor, the defendant's role in the crime, is the sole factor militating in favor of Venable's claim: as relevant to the § 922(g) offense, which criminalizes possession of a firearm by a convicted felon, Venable, Turner, and Zechman each have that status, and were therefore identically situated in that regard. With

respect to the fifth *Olvis* factor, the defendant's candor and willingness to plead guilty, we note that unlike Venable, who was obstreperous towards law enforcement and did not plead guilty, Turner and Zechman appear to have immediately pleaded guilty and cooperated with law enforcement. Indeed, it was that cooperation that led the police to Venable.

The sixth, seventh, eight, and ninth factors—the amount of resources required to convict the defendant, the extent of prosecutorial resources, the potential impact of a prosecution on related investigations and prosecutions, and prosecutorial priorities for addressing specific types of illegal conduct—are all affected by Project Exile's role in this case. Venable's case was referred to the United States Attorney's Office by state authorities in Richmond pursuant to a well-established, longstanding, federal-state law enforcement initiative, for which Richmond authorities provide resources, including a prosecutor to assist with federal prosecutions. By contrast, Turner and Zechman could not have been prosecuted under that initiative, and Campbell County does not provide any resources for federal prosecutions in the Eastern District. Moreover, as noted above, Campbell County authorities expressed an interest in vindicating the rights of property owners within their county; federal prosecution could be viewed as impeding the vindication of that interest. Finally, Project Exile reflects prosecutorial priorities for addressing a specific type of illegal conduct: cases involving firearm-related offenses which are referred to federal authorities by local and state authorities. Again, it bears note that in order to prosecute Turner and Zechman, the United States Attorney's Office for the Eastern District of Virginia would have had to reach outside the Project Exile referral process, outside the geographic reach of Project Exile, and outside its own district.

In sum, given all of the circumstances and differentiating factors between Venable's case on the one hand, and Turner's and Zechman's cases on the other hand, Venable has failed to make a credible showing that a similarly situated defendant of

another race has evaded prosecution under Project Exile in order to obtain discovery on his selective prosecution claim.

B.

We note as well that even if Venable had produced some evidence establishing that similarly situated individuals of a different race were not prosecuted, in order to obtain discovery on his selective prosecution claim he would also have to produce some evidence establishing that the decision to prosecute him was invidious or in bad faith. For the reasons discussed below, he falls short in this regard as well.

In order for a decision to prosecute to be "invidious or in bad faith," thereby reflecting discriminatory intent, the government must be more than aware that a federal prosecutorial policy may result in the prosecution of one group more than another because discriminatory intent implies that the government "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (internal quotations omitted). We have held that, absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim. *Olvis*, 97 F.3d at 745. "This is consistent," we have observed, "with the general rule that in cases involving discretionary judgments essential to the criminal justice process, statistical evidence of racial disparity is insufficient to infer that prosecutors in a particular case acted with a discriminatory purpose." *Id.* at 746 (internal quotations omitted). Notably, there is *not* "a presumption that unexplained statistical evidence of racial disparity proves racial animus." *Id.* Instead, it is the defendant who bears the burden of making a credible showing that the statistical evidence amounts to some evidence of discriminatory intent. *Id.*

In *Olvis*, we found fault with a statistical study that showed that in the Norfolk-Newport News, Virginia, area, "of all the

federal crack cocaine trafficking prosecutions in federal court since 1992 in which the defendant's race was apparent, over 90 percent involved black defendants." 97 F.3d at 745. We determined that the study "provide[d] no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes." *Id.* Without an appropriate basis for comparison, the percentage of African American crack cocaine defendants proved nothing, unless it could be presumed that crack cocaine violations were committed proportionately by all races, an assumption rejected by the Supreme Court in *Armstrong*. *See* 517 U.S. at 470.

Just as in *Olvis*, the statistical evidence provided by Venable, showing that for the three years preceding his prosecution—2005, 2006, and 2007—approximately 87 percent of the firearms prosecutions under Project Exile were brought by black defendants, contains no appropriate basis for comparison. It provides no statistical evidence about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes. It does not even provide any evidence regarding the proportion of blacks residing within the relevant geographical area.

Moreover, even were we to accept Venable's statistical evidence as probative of discriminatory intent, we are unpersuaded by the additional facts that Venable points to as evidence that the prosecution against him was invidious or in bad faith. First, we reject his assertion, for which he offers no supporting evidence, that the circumstances surrounding his arrest and indictment "raise[ ] questions concerning whether the Government's decision to prosecute him under Project Exile was affected by race." Appellant's Br. 18. Second, his contentions that the government's arguments explaining why Venable's selective prosecution claim should fail are "inconsistent," Appellant's Br. 18, and that the government chose not to prosecute two "far more culpable" white individuals,

Appellant's Br. 19, simply rehash his meritless argument that other similarly situated individuals were not prosecuted.

In sum, on the record presented, Venable has failed to carry his burden of producing some evidence to make a credible showing of both discriminatory effect and intent.[4]

---

[4]Finally, we feel compelled to note that advocates, including government lawyers, do themselves a disservice when their briefs contain disrespectful or uncivil language directed against the district court, the reviewing court, opposing counsel, parties, or witnesses. *See, e.g., Dranow v. United States*, 307 F.2d 545, 549 (8th Cir. 1962) ("In light of the too numerous decisions of this and other Courts of Appeals, it should not be necessary for us to repeat, [a] brief should not contain language disrespectful to the court nor to opposing counsel and ordinarily a brief containing such scurrilous and scandalous matter should be stricken from the files." (internal quotations omitted)); 36 C.J.S. Federal Courts § 557 (2011) ("Abusive, scandalous, scurrilous, . . . or disrespectful language . . . should not be inserted in the brief."); 4 C.J.S. Appeal and Error § 734 (2011) ("The appellate brief should not contain disrespectful, scandalous, or abusive language directed against the court of review, trial judge, opposing counsel, or parties or witnesses. A brief in no case can be used as a vehicle for the conveyance of . . . insult, disrespect or professional discourtesy of any nature . . . invectives are not argument, and have no place in legal discussion."). Unfortunately, the government's brief is replete with such language: it disdains the district court's "abrupt handling" of Appellant's first case, Appellee's Br. 19; sarcastically refers to Appellant's previous counsel's "new-found appreciation for defendant's mental abilities," Appellee's Br. 21; criticizes the district court's "oblique language" on an issue unrelated to this appeal, Appellee's Br. 22; states that the district court opinion in *Jones* "revealed a crabby and complaining reaction to Project Exile," Appellee's Br. 57; insinuates that the district court's concerns "require[ ] a belief in the absurd that is similar in kind to embracing paranormal conspiracy theories," Appellee's Br. 59; and accuses Appellant of being a "charlatan" and "exploit[ing] his identity as an African-American," Appellee's Br. 61. The government is reminded that such disrespectful and uncivil language will not be tolerated by this court. *See Ruston v. Dallas County Tex.*, 320 F. App'x. 262, 263 (5th Cir. 2009) (striking pleadings because they "contain abusive and disrespectful language"); *Carter v. Daniels*, 91 F. App'x. 83, 84 (10th Cir. 2004) (finding party's "language in his brief intemperate and disrespectful of this court and the district court," and cautioning party that it may be subject to sanctions if it contin-

## III.

For the foregoing reasons we affirm the judgment of the district court.

*AFFIRMED*

---

ues to file such pleadings); *Hamad v. Desahazo*, 1996 WL 556788, at *1 (5th Cir. 1996)(unpublished) (warning party that "the use of abusive and uncivil language, as displayed in his appellate brief, will not be tolerated by this court" and directing him to "review all pending appeals to make sure that they do not contain such language").