**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4758**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHANE ELLIOTT HARE, a/k/a Play,

Defendant - Appellant.

**No. 14-4770**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GREGORY ANTOINE WILLIAMS, a/k/a "J",

Defendant - Appellant.

**No. 14-4832**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTONIO EDWARDS, a/k/a Tank,

Defendant - Appellant.

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:13-cr-00650-DKC-1; 8:13-cr-00650-DKC-2; 8:13-cr-00650-DKC-3)

Argued: January 28, 2016          Decided: April 19, 2016

Before SHEDD and FLOYD, Circuit Judges, and Loretta C. BIGGS, United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge Shedd and Judge Biggs joined. Judge Shedd wrote a separate concurring opinion.

**ARGUED**: Michael Daniel Montemarano, MICHAEL D. MONTEMARANO, PA, Columbia, Maryland, for Appellants. Rod J. Rosenstein, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF**: Michael Lawlor, LAWLOR & ENGLERT, LLC, Greenbelt, Maryland, for Appellant Williams. Jonathan Alan Gladstone, Annapolis, Maryland; Marta K. Khan, THE LAW OFFICE OF MARTA K. KHAN, LLC, Baltimore, Maryland, for Appellant Edwards. Joseph R. Baldwin, Assistant United States Attorney, Jennifer R. Sykes, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

FLOYD, Circuit Judge:

A jury convicted Appellants Shane Hare, Gregory Williams, and Antonio Edwards of drug, robbery, and firearm offenses based on their participation in a plan to rob a cocaine "stash house." Unbeknownst to Appellants, the stash house did not actually exist, but was fabricated by undercover federal agents as part of a sting operation. Appellants challenge the district court's denial of their motion for discovery into potential race discrimination by law enforcement and motion to dismiss the indictment on due process grounds. They also challenge various other aspects of their convictions. For the reasons set forth below, we affirm.

I.

In February 2013, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) received information from a confidential informant identifying Marvin Bowden as an armed drug trafficker and suspect in several burglaries, armed robberies, and home invasions in Prince George's County, Maryland. Based on this information, ATF and the Prince George's County Police Department (PGPD) initiated an undercover operation whereby they would present Bowden with the opportunity to rob a fictitious cocaine stash house and, if all went according to plan,

3

ultimately arrest him and any accomplices for conspiring to traffic drugs and related crimes.[1]

On April 19, 2013, PGPD undercover detective William Weathers met with Bowden to inform him of a potential opportunity to rob a drug stash house. Detective Weathers explained that he knew someone involved in drug trafficking who was looking for a group of people to help him rob a stash house containing several "bricks" of cocaine. J.A. 42, 246. In response, Bowden stated "that's what I do!" several times and indicated that he usually worked with two or three other people. J.A. 42. Bowden and Detective Weathers discussed the robbery further before Bowden left, telling Detective Weathers to let him know how many people to bring.

On May 3, 2013, Detective Weathers again met with Bowden and introduced him to ATF Special Agent Christopher Rogers, also acting undercover.[2] Agent Rogers told Bowden that he was a drug courier for a Mexican cartel whose job was to transport 5 kilograms of cocaine each month from the cartel's stash house in Baltimore to Richmond, Virginia. Agent Rogers explained that he

[1] ATF has conducted such investigations, also known as "home invasion" investigations, across the country in recent years. See, e.g., United States v. Davis, 793 F.3d 712 (7th Cir. 2015)(en banc); United States v. Black, 733 F.3d 294 (9th Cir. 2013); United States v. Sanchez, 138 F.3d 1410 (11th Cir. 1998).

[2] This meeting and the subsequent three meetings between Agent Rogers, Bowden, and Appellants were recorded and transcribed.

4

wanted to rob the stash house because he was unhappy with his pay and needed an experienced crew because the house, which contained an additional 10 to 15 kilograms of cocaine, was guarded by three heavily armed men. Bowden agreed to commit the robbery, stating that he had a crew of three or four people and "that's what we do for a living." J.A. 43. Agent Rogers asked if Bowden had weapons and Bowden confirmed that he did, again stating, "that's all we do!" Id.

On May 9, 2013, Agent Rogers met with Bowden and his crew, consisting of Appellants Hare, Williams, and Edwards. Bowden himself recruited Appellants, none of whom were previously known to ATF. At the meeting, Agent Rogers repeated his story of being a disgruntled drug courier looking for a crew to rob his cartel's stash house. Agent Rogers stated that he wanted to keep 2 kilograms of cocaine for himself but the crew could divide whatever else they were able to seize, emphasizing that the stash house contained 10 to 15 kilograms of cocaine. He also cautioned that the stash house guards had a "chopper" (i.e., an automatic weapon). The crew (led by Edwards) discussed how to execute the robbery. They decided that the fastest two, Hare and Williams, would enter first while shouting "police!" and secure the chopper. Bowden and Edwards would follow and secure the guards using zip ties and duct tape. If necessary, Appellants and Bowden would shoot the guards below

5

the waist but would not shoot to kill. When Agent Rogers asked if Appellants had weapons, Edwards replied "[e]verybody got their own gun," and Williams confirmed, "[t]hat ain't no problem." J.A. 780. Edwards also proposed a "Plan B" in case they were unable to enter the stash house. Under Plan B, Bowden and Appellants would pretend to rob Agent Rogers of his 5 kilogram shipment, and the group would split the lesser amount. Agent Rogers stated that he could procure a rental car for their getaway. Appellants agreed to the plan and gave Agent Rogers their phone numbers.

Appellants, Bowden, and Agent Rogers next met on May 14, 2013. Agent Rogers informed the group that his next drug pick-up would be at 1:00 p.m. two days later, on May 16, which is when the robbery would occur. Edwards confirmed that the group was "ready." J.A. 795. Agent Rogers advised that they should be assembled by 10:00 a.m. on the day of the robbery, and Bowden proposed staying in a hotel the night before so they would already be together. The crew (again led by Edwards) reviewed the plan (i.e., Plan A), including that once Agent Rogers entered the stash house to pick up his shipment, Bowden and Appellants would burst in and Agent Rogers would "hit the floor" to avoid getting shot. J.A. 798. Bowden and Appellants would also wear gloves and get haircuts to avoid leaving fingerprints or DNA. When Agent Rogers asked about their weapons, Williams

6

confirmed that they would bring "hand tools" and potentially an automatic pump shotgun. The group again discussed Plan B if Appellants and Bowden could not enter the stash house to execute Plan A.

On May 16, 2013, Bowden and Appellants met Agent Rogers at a storage facility, which was the predetermined staging location for the robbery. The crew confirmed that they were ready to proceed and reviewed both Plan A and Plan B. Williams confirmed that they would be armed. Agent Rogers then gave the take-down signal and ATF agents surrounded the group, arresting Bowden and Appellants. ATF agents recovered a Kimber brand firearm from inside a locked glove box in Bowden's vehicle, a Beretta brand firearm that Hare had thrown under the vehicle, a black mask, and a pair of gloves.

Appellants were each charged with the same four counts: (1) conspiracy to interfere with commerce by robbery (i.e., a "Hobbs Act" robbery), in violation of 18 U.S.C. § 1951(a); (2) conspiracy to possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846; (3) conspiracy to possess a firearm in furtherance of a drug trafficking crime or a crime of violence, in violation of 18 U.S.C. § 924(o); and (4) possession of a firearm in furtherance of a drug trafficking crime or a

7

crime of violence, in violation of 18 U.S.C. § 924(c).[3]  Edwards was additionally charged with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1).

Before trial, Appellants moved for discovery into whether race played a role in ATF's decision to target Bowden and Appellants for a stash house sting operation.  The district court denied the motion, though it ordered the government to produce to Appellants one page out of ATF's training materials for conducting such operations.  Appellants also moved to dismiss the indictment on the ground that the government had engaged in outrageous conduct that violated their due process rights.  The district court denied this motion as well.

After a seven-day trial, the jury returned a special verdict finding Appellants guilty on all counts.  The district court sentenced Hare to 132 months of imprisonment, Williams to 150 months, and Edwards to 240 months.  Appellants filed this appeal challenging, among other things, the district court's denial of their motion for discovery and motion to dismiss, as well as their convictions for the firearm offenses in Counts 3 and 4.

---

[3] Bowden entered a plea agreement and ultimately received a ten-year sentence.

II.

A.

Appellants first contend that the district court erred in denying their motion for discovery into whether ATF targeted Bowden and Appellants for a stash house sting operation because they are black, i.e., whether ATF engaged in selective enforcement. In support of their motion, Appellants presented evidence indicating that there had been a total of 5 stash house sting cases prosecuted in the District of Maryland since 2011 (including this case) and that all 20 defendants in those cases were black. On appeal, Appellants have revised those figures to 8 prosecutions involving 32 defendants, all of whom are black. Also on appeal, Appellants identify a "known white 'crew[]' involved in robberies and drug distribution" in the District of Maryland whose members were arrested and prosecuted, but were "not the subject of a 'stash house sting' or other ATF investigation." Appellants Br. 36 (citing United States v. Paschall, Nos. 13-359, 13-360, 13-361 (D. Md. July 16, 2013)).[4] Appellants argue that this evidence entitles them to discovery in support of their selective enforcement claim. Broadly speaking, Appellants seek "discovery concerning the methodology employed by ATF in these cases, their selection criteria for

_____

[4] The government does not dispute Appellants' statistics or their characterization of the Paschall case.

9

targets, their use of informants, and any efforts to ensure law enforcement did not ensnare the otherwise innocent and those lacking predisposition." Appellants Br. 22.

The district court denied Appellants' motion, finding that their evidence did not satisfy the standard for discovery set forth in United States v. Armstrong, 517 U.S. 456 (1996). Nevertheless, the court ordered the government to investigate whether ATF had a manual or "playbook" related to stash house sting operations and to provide any such manual to the court for in camera review. The government produced an ATF operations manual that was created in July 2013, after the events in this case. The government indicated, however, that ATF agents in the District of Maryland had been trained in conducting stash house stings prior to their investigation of Bowden and Appellants. The court ordered the government to provide any such training materials to the court for in camera review. After reviewing the government's submission, the court ordered the government to produce to Appellants one page, which set forth the "procedures and guidelines for selecting a target." Suppl. J.A. 5. The court noted that while "this page is not in any way suggestive of discriminatory animus, disclosure is warranted insofar as [Appellants] would otherwise have no way of learning the government's criteria for selecting targeted individuals." Id. at 5-6. On appeal, Appellants contend that they should not be

10

held to the Armstrong standard as it applies to claims of selective prosecution rather than selective enforcement, and that their evidentiary showing entitles them to discovery beyond what was ordered by the district court. Our review is de novo. See United States v. Venable, 666 F.3d 893, 900 (4th Cir. 2012).

B.

In Armstrong, the Supreme Court addressed the standards of proof applicable to a claim of selective prosecution, i.e., a claim that the "prosecutor has brought the charge for reasons forbidden by the Constitution," such as race. 517 U.S. at 463. The Court explained that the Attorney General and United States Attorneys, having been designated by the President to help execute the nation's laws, enjoy "broad discretion" and a "presumption of regularity" in their prosecutorial decisions. Id. at 464 (quotations omitted). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary" by demonstrating that a prosecutorial policy "had a discriminatory effect and . . . was motivated by a discriminatory purpose." Id. at 465 (quotation omitted). The defendant must "establish both (1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious or in bad faith."

11

United States v. Olvis, 97 F.3d 739, 743 (4th Cir. 1996) (quotations omitted).

The standard for obtaining discovery in support of a selective prosecution claim is only "slightly lower" than for proving the claim itself. Venable, 666 F.3d at 900. Instead of presenting "clear evidence," the "defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." Olvis, 97 F.3d at 743. Because discovery imposes "many of the costs present when the Government must respond to a prima facie case of selective prosecution," the standard for obtaining discovery is "correspondingly rigorous" and "should itself be a significant barrier to the litigation of insubstantial claims." Armstrong, 517 U.S. at 464, 468.

This Court has adopted Armstrong's standard for proving selective prosecution as the standard for proving selective enforcement. See United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996). We have not, however, specifically addressed whether Armstrong's standard for discovery applies in the selective enforcement context. Nevertheless, this standard provides the starting point for our analysis of Appellants' discovery motion.

Appellants' statistical evidence, indicating that all 32 defendants prosecuted in stash house sting cases in the District

12

of Maryland have been black, does not meet Armstrong's discovery standard. We have explained that "absent an appropriate basis for comparison, statistical evidence [of racial disparity] alone cannot establish any element of a discrimination claim." Olvis, 97 F.3d at 745. In Olvis, the defendants presented evidence showing that in the Norfolk–Newport News area of Virginia, "more than 90% of those indicted . . . since 1992 for crack cocaine trafficking are black." 97 F.3d at 741, 745. We found this insufficient to demonstrate a discriminatory effect, as the data provided "no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes." Id. at 745. "Without an appropriate basis for comparison, raw data about the percentage of black crack cocaine defendants prove[d] nothing." Id. Similarly, in Venable, we found that statistics showing that blacks made up approximately 87% of those charged with certain firearm offenses in the Eastern District of Virginia did not constitute evidence of discriminatory intent, as the data provided "no statistical evidence about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes." 666 F.3d 903.

Appellants' statistical evidence similarly provides no appropriate basis for comparison, as it contains no data on

13

similarly situated white individuals who could have been targeted for stash house sting investigations but were not. Instead, Appellants point to one white crew "involved in robberies and drug distribution" in the District of Maryland. Appellants Br. 36. It is far from clear, however, that this crew is "similarly situated," in the sense that "their circumstances present no distinguishable legitimate [enforcement] factors that might justify making different [enforcement] decisions with respect to them." See Venable, 666 F.3d at 900-01. While a Department of Justice press release indicates that the Paschall defendants were involved in drug trafficking and armed home invasions, it is not known, for example, whether the crew members' criminal histories indicated that they would be receptive to a stash house robbery scenario, or whether ATF had the means of infiltrating this crew undercover.[5] Furthermore, this isolated example is more "anecdotal evidence," Armstrong, 517 U.S. at 470, than it is

---

[5] See U.S. Atty's Office, Dist. of Md., Dept. of Justice, 16 Defendants Charged In A Commercial Burglary Ring and Drug Conspiracy (July 18, 2013), https://www.justice.gov/usao-md/pr/16-defendants-charged-commercial-burglary-ringand-drug-conspiracy (describing defendants as committing "commercial burglaries, home invasion armed robberies, arsons and other crimes at convenience stores, gas stations, financial institutions, restaurants[,] homes and liquor stores," in which "[s]afes and ATMs are primarily targeted and taken," and "[l]ottery tickets and cigarettes are also taken along with other valuables") (saved as ECF opinion attachment).

14

"statistical evidence" demonstrating that "a greater percentage of whites could have been [investigated]." See Venable, 666 F.3d at 903.

Even if we assumed that Appellants' statistical evidence "had a basis for comparison that showed discriminatory effect, it would not necessarily prove discriminatory intent." Olvis, 97 F.3d at 746. As a general matter, "in cases involving discretionary judgments 'essential to the criminal justice process,' statistical evidence of racial disparity is insufficient to infer . . . a discriminatory purpose." Id. (quoting McCleskey v. Kemp, 481 U.S. 279, 297 (1987)). Appellants' statistical evidence, with its relatively small sample size and weak basis for comparison, is clearly insufficient. See id. at 745. Because Appellants offer no other evidence that ATF's actions were "invidious or in bad faith," they have not shown discriminatory intent.[6] Thus,

_____

[6] Appellants allege that ATF was "willfully blind" to the racially disparate impact of its stash house sting operations; however, willful blindness does not evince discriminatory intent, as "discriminatory intent implies that the government 'selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" Venable, 666 F.3d at 903 (quoting Wayte v. United States, 470 U.S. 598, 610 (1985)).

Appellants also suggest that ATF deviated from its protocol by failing to investigate Appellants' criminal backgrounds to ensure that they were violent offenders, and that such deviation is "evidence that improper purposes are playing a role." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252,
(Continued)

15

Appellants have not put forth "some evidence" making a "credible showing" of the elements of a discrimination claim.

Appellants argue, however, that their selective enforcement claim should not be held to the discovery standard articulated in Armstrong for claims of selective prosecution. Appellants highlight important differences in proving the two types of claims. First, Appellants note that it is considerably harder to demonstrate that a law enforcement action has a discriminatory effect, as there are less likely to be records of similarly situated individuals who were never investigated or arrested. As the Seventh Circuit has explained, in a case involving racial profiling in traffic stops:

> In a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped.

Chavez v. Illinois State Police, 251 F.3d 612, 640 (7th Cir. 2001). In the stash house sting context, a defendant would face

267 (1977). However, ATF protocol requires investigation of the target, in this case Bowden. The record indicates that ATF investigated Bowden and that he satisfied ATF's criteria for a stash house sting target. Finally, that ATF presented Appellants with a lucrative opportunity involving more than 10 to 15 kilograms of cocaine does not suggest a discriminatory motive.

considerable difficulty obtaining credible evidence of similarly situated individuals who were not investigated by ATF. Even if a defendant could, for example, use state or federal prosecutions to identify white individuals involved in drug offenses or armed robberies, without discovery into what ATF knew about these individuals, the defendant would be hard pressed to demonstrate that there were no distinguishing factors that would justify different enforcement treatment.

Second, Appellants note that Armstrong was primarily concerned with respecting the province of federal prosecutors, who are "designated by statute as the President's delegates to help him" execute the nation's laws, and thus enjoy a "presum[ption] that they have properly discharged their official duties." Armstrong, 517 U.S. at 464. Law enforcement officers, however, are not accorded equal deference. Again, the Seventh Circuit offers cogent analysis:

> Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause. . . . Before holding hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done. In sum, the

17

> sort of considerations that led to the outcome in Armstrong do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.

United States v. Davis, 793 F.3d 712, 720-21 (7th Cir. 2015) (en banc) (finding evidence that the "overwhelming majority" of defendants prosecuted in stash house sting cases in the Northern District of Illinois were black or Hispanic sufficient to warrant discovery on an incremental basis).

Appellants' arguments are well taken. However, even if we assume that their evidentiary showing is sufficient to warrant discovery into selective enforcement, Appellants have not shown that they are entitled to discovery beyond what the government has already produced. The government has already provided Appellants with ATF's criteria for choosing a stash house sting target, and the district court reviewed an even broader set of ATF documents for information relevant to Appellants' selective enforcement claim. ATF's selection criteria do not suggest any discriminatory motive. Instead, they indicate that ATF followed its protocol in selecting Bowden as a target, and Bowden, not ATF, recruited Appellants. We conclude that Appellants have received all the discovery to which they are entitled, and affirm the district court's denial of their motion for discovery.

18

Appellants next challenge the district court's denial of their motion to dismiss the indictment on due process grounds. Because the relevant facts are not in dispute, our review is de novo. See United States v. Hatcher, 560 F.3d 222, 224 (4th Cir. 2009).

Appellants claim that ATF's conduct in this case was so egregious as to violate their Fifth Amendment due process rights and thus preclude prosecution. They invoke the theory, first articulated in United States v. Russell, 411 U.S. 423 (1973), that there may be "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." Id. at 431–32. We have previously observed that the "outrageous conduct" doctrine is "highly circumscribed," United States v. Hasan, 718 F.3d 338, 343 (4th Cir. 2013), and applies "only in rare cases." United States v. Jones, 18 F.3d 1145, 1154 (4th Cir. 1994). The government's actions "must be 'shocking' or 'offensive to traditional notions of fundamental fairness.'" Hasan, 718 F.3d at 343 (quoting United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991)). See also Osborne, 935 F.2d at 36 (noting the "high shock threshold" of appellate courts faced with "extremely unsavory government conduct"). "As a practical matter, only

19

those claims alleging violation of particular constitutional guarantees are likely to succeed." United States v. Jones, 13 F.3d 100, 104 (4th Cir. 1993).

Appellants' theory as to a due process violation is less than clear. However, their primary arguments appear to be that ATF behaved outrageously by failing to investigate whether Appellants were predisposed to committing stash house robberies or similar crimes, and by providing an inducement so lucrative as to be unreasonable.[7] Appellants also appear to object generally to ATF's use of the stash house robbery scenario as an investigative tool. We address these arguments in turn.

The government does not deny that ATF had no knowledge of Appellants before Bowden introduced them to Agent Rogers, and

---

[7] Government inducement and a defendant's lack of predisposition are the elements of an entrapment defense. See United States v. Sligh, 142 F.3d 761, 762 (4th Cir. 1998). Appellants acknowledge that the district court allowed them to argue entrapment and gave the entrapment jury instruction they requested. On appeal, Appellants assert that they are not raising an entrapment claim. Thus, we evaluate their arguments under the outrageous government conduct standard.

Nevertheless, we note that we would reject an entrapment claim, were Appellants raising one. When the issue of entrapment is submitted to the jury, a guilty verdict "comprehends a finding of no entrapment" and "an appellate court may overturn this determination only if no rational trier of fact could have found predisposition beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution." United States v. Jones, 976 F.2d 176, 180 (4th Cir. 1992). Under the predisposition principles explained herein, a reasonable juror could have found predisposition on the part of Appellants.

20

that ATF subsequently undertook no investigation to determine whether they had violent criminal histories and were therefore appropriate targets for a stash house sting. Indeed, it appears that Hare and Williams have only minimal criminal records and no record of violent crimes. See J.A. 176, 180. While this is troubling, particularly since Appellants now each face more than 10 years of imprisonment, it does not rise to the level of outrageous conduct.

Appellants were not targeted by ATF but recruited by Bowden, whom ATF targeted based on information that he was an active, armed drug trafficker. "[I]t would undermine law enforcement's ability to investigate and apprehend criminals if its otherwise acceptable conduct became outrageous merely because an individual with no known criminal history whom the government did not suspect of criminal activity joined the criminal enterprise at the last minute at the behest of codefendants." United States v. Black, 733 F.3d 294, 308 n.11 (9th Cir. 2013). Furthermore, it was not outrageous for the government to infer that Bowden would recruit people who were willing and had the requisite experience to rob an armed stash house. This inference was bolstered by Appellants' ready response to Agent Rogers's proposal. They assented to the proposal at their first meeting with Rogers, planned how to execute the robbery, and at no point attempted to withdraw.

21

"[T]he ready commission of the criminal act amply demonstrates the defendant's predisposition." Jacobson v. United States, 503 U.S. 540, 550 (1992); see also Osborne, 935 F.2d at 37-38 ("[T]he fact that a defendant has not previously committed any related crime is not proof of lack of predisposition. Rather, predisposition is found from the defendant's ready response to the inducement offered.").

We also do not find outrageous the size of the inducement, 15 to 20 kilograms of cocaine in total.[8] This amount is considerably less than the quantity of cocaine at issue in other stash house sting cases. See, e.g., Black, 733 F.3d at 299 (finding no outrageous government conduct where sting involved 28 to 46 total kilograms of cocaine); United States v. Mayfield, 771 F.3d 417, 422, 441 (7th Cir. 2014) (en banc) (describing sting that involved 26 to 38 total kilograms of cocaine as a "typical stash-house robbery" that would not, by itself, "qualify as an illegitimate inducement"). Appellants assert that a typical stash house in Maryland contains less than 15 to 20 kilograms of cocaine. However, even assuming that 15 to 20 kilograms is a large quantity by Maryland standards, that would

_____

[8] "Inducement" for purposes of entrapment means "solicitation plus some overreaching or improper conduct on the part of the government." United States v. Hsu, 364 F.3d 192, 200 (4th Cir. 2004). As entrapment is not before us, we express no view on whether the amount of cocaine at issue qualifies as an "inducement" in the entrapment sense of the word.

22

not render ATF's conduct outrageous, particularly since Agent Rogers concocted various obstacles to executing the robbery, including that the stash house had three armed guards and the robbery would take place during the day. Cf. United States v. Kindle, 698 F.3d 401, 414-15 (7th Cir. 2012) (Posner, J., dissenting) (explaining that stash house stings are "a disreputable tactic" in part because "the police can convince a suspect that the stash house robbery would be a shockingly simple and easy crime to commit"), vacated en banc sub nom. United States v. Mayfield, 771 F.3d 417 (7th Cir. 2014).

Finally, we do not find it outrageous for ATF to utilize stash house stings as an investigative tool. We have noted that "[o]utrageous is not a label properly applied to conduct because it is a sting or reverse sting operation involving contraband." United States v. Goodwin, 854 F.2d 33, 37 (4th Cir. 1988). Concededly, a stash house sting entails considerable government involvement—including direct solicitation of the target and total control over the parameters of the robbery, particularly the quantity of cocaine held in the fictitious stash house—and appears highly susceptible to abuse. We may further question the propriety of using such a tool to prosecute individuals with no violent criminal histories and who demonstrated an

inclination to pursue the less violent Plan B.[9]  However, the standard for outrageous government conduct is high, and we cannot say that ATF's conduct in this case was "so outrageous as to shock the conscience of the court."  Osborne, 935 F.2d at 36. We know of no court of appeals to hold otherwise, while several have found no due process violation even when ATF's conduct was more objectionable than it was here.  See Black, 733 F.3d at 299 (finding no outrageous conduct where ATF "trolled" for targets by paying a confidential informant to "try and find some people" willing to commit a home invasion, which the informant did by "going to the bars" in a "bad part of town" to try and "meet people"); see also United States v. Rodriguez, 603 F. App'x 306 (5th Cir. 2015); United States v. Sanchez, 138 F.3d 1410 (11th Cir. 1998).  Appellants' arguments, whether considered alone or collectively, do not establish outrageous government conduct. We affirm the district court's denial of Appellants' motion to dismiss the indictment.

IV.

Appellants next challenge their convictions for possessing a firearm in furtherance of a drug trafficking crime or a crime

---

[9] Indeed, in Count 2 the jury found Appellants guilty of conspiring to traffic "500 grams but less than 5 kilograms" of cocaine, J.A. 977-78, consistent with the plan to stage a robbery of Agent Rogers's 5 kilogram shipment.

24

of violence, in violation of 18 U.S.C. § 924(c) (Count 4). Appellants contend that the district court's instructions on aiding and abetting liability were erroneous under Rosemond v. United States, 134 S. Ct. 1240 (2014). Appellants also contend that under Johnson v. United States, 135 S. Ct. 2551 (2015), a Hobbs Act robbery does not constitute a crime of violence and therefore cannot serve as the predicate crime for a conviction under § 924(c), or the related conspiracy charge in Count 3. These arguments are unavailing.

A.

In Rosemond, the Supreme Court held that to establish a violation of § 924(c) based on the theory that the defendant aided and abetted the offense, the government must prove "that the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission." 134 S. Ct. at 1243. This is because "[w]hen an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or . . . withdraw from the enterprise." Id. at 1249. However, "when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance . . . [or] may at that late point have no realistic opportunity to quit the

25

crime." Id. In such case, "the defendant has not shown the requisite intent to assist a crime involving a gun." Id.

Appellants contend that the district court's aiding and abetting instructions were erroneous because they did not require Appellants to know in advance that guns would be involved in the robbery. Because Appellants did not object to the instructions below, plain error review applies. United States v. Robinson, 627 F.3d 941, 953 (4th Cir. 2010). Appellants must show that "an error occurred, that the error was plain, and that the error affected [their] substantial rights," meaning that it "actually affected the outcome of the proceedings." United States v. Hastings, 134 F.3d 235, 239-40 (4th Cir. 1998). Even then, the Court "should not exercise [its discretion to correct the error] unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 239 (quotation omitted).

Assuming that the district court's instructions were erroneous and the error was plain, we find that the error did not affect Appellants' substantial rights. Hare admitted to possessing the Beretta firearm, and the verdicts against Williams and Edwards may be sustained under the Pinkerton theory of liability. "The Pinkerton doctrine makes a person liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the

26

conspiracy." United States v. Ashley, 606 F.3d 135, 142-43 (4th Cir. 2010). The jury was properly instructed on Pinkerton liability and the evidence amply demonstrates that it was reasonably foreseeable to Williams and Edwards that a co-conspirator would possess a firearm. At each meeting, Williams and Edwards discussed the firearms the crew would bring and the possibility of shooting the stash house guards. At no point was it suggested that the crew would proceed without firearms, even in the context of Plan B. Thus, any error in the aiding and abetting instruction does not satisfy the plain error standard. See Robinson, 627 F.3d at 954 (explaining that under the plain error prejudice requirement, "where a defendant was indicted under multiple [theories] of an offense but subjected to erroneous jury instructions on one of those [theories,]" the defendant "must demonstrate that the erroneous instruction given resulted in his conviction, not merely that it was impossible to tell under which [theory] the jury convicted"). See also United States v. Saunders, 605 F. App'x 285, 288-89 (5th Cir. 2015) (finding that Rosemond error in aiding and abetting instruction did not affect defendant's substantial rights "because the jury was given a correct Pinkerton instruction" and it was "reasonably foreseeable that [defendant's co-conspirator] would carry a gun to a bank robbery"); United States v. Young, 561 F. App'x 85, 92 (2d Cir. 2014) (explaining that "even if there had

27

been error regarding aiding and abetting" in light of Rosemond, "it was harmless because ample evidence supported [defendant's] liability under Pinkerton").

B.

Appellants also challenge their firearm convictions on the ground that, after the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2551 (2015), a Hobbs Act robbery no longer qualifies as a crime of violence. Thus, Appellants claim, their convictions in Count 1 for committing a Hobbs Act robbery cannot support their convictions in Count 4 for possessing a firearm in furtherance of a drug trafficking crime or a crime of violence, or the related conspiracy offense in Count 3.

We need not reach the merits of this argument.[10] Section 924(c) prohibits the possession of a firearm in furtherance of a

---

[10] In Johnson, the Supreme Court held that the definition of "violent felony" found in the residual clause of the Armed Career Criminal Act is unconstitutionally vague. 135 S. Ct. at 2557. That clause defines a "violent felony" as any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Section 924(c) similarly contains a residual clause that defines a "crime of violence" as any felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). Appellants argue that by extension of the logic in Johnson, the residual clause in § 924(c) is also unconstitutionally vague. Appellants further argue that a Hobbs Act robbery does not otherwise (Continued)

crime of violence or a drug trafficking crime. As the district court explained to the jury, Appellants could be found liable if they possessed a gun either in furtherance of the crime of violence charged in Count 1 or in furtherance of the drug trafficking crime charged in Count 2. The special verdict form clearly shows that the jury found Appellants guilty of possessing a firearm in furtherance of both crimes. See J.A. 978-81. Thus, even assuming that a Hobbs Act robbery is not a crime of violence, Appellants' verdicts may be sustained because the jury found Appellants guilty of possessing, and conspiring to possess, a firearm in furtherance of the drug trafficking crime of which they were convicted in Count 2. See United States v. Najjar, 300 F.3d 466, 480 n.3 (4th Cir. 2002) (explaining that while "[a] general verdict . . . should be set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected[,] [s]pecial verdicts obviate this problem by allowing a court to determine upon what factual and legal basis the jury decided a given question" (quotation omitted)). Accordingly, we uphold Appellants' convictions.

---

qualify as a crime of violence, and thus cannot be the basis for a conviction under § 924(c).

29

V.

Appellants raise various other challenges to their conviction and sentences. We have reviewed Appellants' arguments and find them to be without merit. Thus, we affirm the district court.[11]

AFFIRMED

---

[11] Because Appellant Edwards is represented by counsel, we deny his motions for leave to file pro se supplemental briefs. See United States v. Penniegraft, 641 F.3d 566, 569 n.1 (4th Cir. 2011).

SHEDD, Circuit Judge, concurring:

I agree completely with the legal analysis of the majority. I write separately to note that, unlike the majority, I am not troubled by the investigation and prosecution of these defendants. The evidence presented in this case shows that these defendants were willing to undertake criminal acts—including violent acts—in connection with the armed robbery of illegal drugs. Law enforcement did not independently recruit these defendants; rather, they were part of a "crew" who were willing to be involved in the armed robbery at the behest of their leader, Bowden, who enlisted their involvement. Moreover, the defendants had the opportunity to present their theory of entrapment to the jury but, not surprisingly under the facts of this case, the jury believed these defendants were predisposed to be involved in the charged offenses.

In short, as the majority correctly holds, the Government conducted itself lawfully, and these defendants were properly convicted and sentenced. There is nothing troubling in that.