**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1454**

BIANCA JOHNSON; DELMAR CANADA; RODNEY HUBBARD; SAVANNAH HUBBARD,

Plaintiffs - Appellants,

v.

ANDREW HOLMES,

Defendant - Appellee,

and

JOHN DOES 1-3; ALBEMARLE COUNTY,

Defendants.

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, Senior District Judge. (3:16-cv-00016-NKM; 3:16-cv-00018-NKM)

Argued: May 7, 2019                    Decided: August 26, 2019

Before MOTZ, KING, and THACKER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

**ARGUED:** Jeffrey Edward Fogel, Charlottesville, Virginia, for Appellants. Jim H. Guynn, Jr., GUYNN & WADDELL, P.C., Salem, Virginia, for Appellee. **ON BRIEF:** Julian F. Harf, GUYNN & WADDELL, P.C., Salem, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this consolidated Fourteenth Amendment equal protection case, Bianca Johnson, Delmar Canada, Rodney Hubbard, and Savannah Hubbard ("Appellants"), who are all African American, assert that they were stopped and searched by Albemarle County Police Officer Andrew Holmes as a result of racial profiling.

To prove their selective enforcement actions against Officer Holmes, Appellants offered statistical evidence obtained from Albemarle County. Appellants assert that this statistical evidence demonstrates a striking disparity between the percentage of traffic summonses that Holmes issues to African Americans, the percentage of traffic summonses that all other officers on the police force issue to African Americans, and the population of African Americans in Albemarle County. According to Appellants, Holmes made it a practice to stop and ticket three times as many African Americans as Caucasians as compared to all other officers on the force, and more than twice as many as compared to all officers who worked the same sectors[1] as Holmes.

The district court concluded that Appellants' statistical evidence failed to demonstrate that similarly situated drivers of a non-protected class were treated differently than Appellants, and, therefore, the district court held that such evidence could not be admitted to prove that Holmes's conduct had a discriminatory effect. Specifically, according to the district court, Appellants' statistics failed to identify white drivers

---

[1] While on patrol duty, officers are assigned to patrol a particular area of the county, called a sector.

3

presenting "no distinguishable legitimate enforcement factors that might justify making different enforcement decisions with respect to them." J.A. 65–66.[2]

Because we conclude that the district court applied an improperly narrow definition of "similarly situated," we reverse the district court's decision to exclude the statistics for the purpose of proving discriminatory effect. However, because the record before us is insufficient for this court to determine whether the statistics offered establish Appellants' claims as a matter of law, we remand to the district court for further fact finding consistent with the proper standard described herein.

## I.

### A.

*Appellants' Traffic Stops*

This consolidated case arises from two separate traffic stops conducted by Holmes. The first stop involves Appellant Delmar Canada, the driver of the stopped car, and Appellant Bianca Johnson, the owner of the car and Canada's fiancée. The second stop involves Appellant Rodney Hubbard, the driver of the stopped car, and his mother, Appellant Savannah Hubbard.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

1.

*Delmar Canada and Bianca Johnson*

Holmes was on duty as a patrol officer for the Albemarle County Police Department on April 26, 2014. As the district court described it, Holmes's "main goal that day was to use traffic enforcement . . . as a tool to do criminal interdiction," including using traffic stops to search for evidence of narcotics. J.A. 39–40 (internal quotation marks omitted). As Holmes explained in his deposition, this was necessary because "[n]o one drives around with signs on the side of their car that say 'I'm carrying drugs.'" *Id.* at 40. In furtherance of these criminal interdiction efforts, Holmes parked his patrol vehicle in the parking lot of a Super 8 motel in Charlottesville, Virginia, which was located across the street from a 7-Eleven convenience store. Holmes then ran the license plates of vehicles in the parking lots of both businesses through a police database.

After running the license plates on several other vehicles, Holmes ran the plates on a BMW 7 Series sedan and learned that the vehicle was registered to Appellant Johnson. Holmes then ran Johnson's information in another police database, where Appellant Canada was listed as a person associated with Johnson. Holmes reviewed Canada's information in the database, obtained a photograph of Canada, and learned that Canada's driver's license had been suspended for failing to pay child support.

At some point during this process, an African American man exited the 7-Eleven and got in the driver's seat of the BMW. Holmes matched the photograph from the police database to the man who entered the vehicle and determined that Canada was the driver. After Canada left the 7-Eleven's parking lot, Holmes initiated a traffic stop of the

5

vehicle. Holmes informed Canada that his license was suspended. Canada stated that he did not know his license had been suspended. Canada contacted Johnson and arranged for her to bring the vehicle registration to him at the stop, which she did. After speaking with Appellants Canada and Johnson, Holmes and another officer who had joined the scene returned to Holmes's patrol vehicle. While there, the other officer observed that Canada was driving a "nice car." J.A. 42. Holmes noted that it was an "expensive car." *Id.* Holmes then issued Canada a summons for driving on a suspended license.

The next day, Holmes applied for and received a search warrant to search Appellants Canada and Johnson's home for a license suspension notice, which DMV records showed had been sent to the home a year earlier.[3] In his trial testimony, Holmes expressed the view that obtaining a search warrant to search an individual's home for a suspension notice could be used as an "investigative tool" by law enforcement to find evidence of possible other, non-traffic-related crimes for which there was not probable

---

[3] Of note, the search warrant application was only for the suspension notice and made no mention of any other criminal activity. Despite this, at some point after the stop but before obtaining the search warrant, Holmes contacted the Jefferson Area Drug Enforcement ("JADE") task force and inquired as to whether Canada was involved in any active drug investigations. Holmes was advised that Canada's name was familiar, but he was not involved in any open investigations by the task force.

Holmes testified that contacting JADE was in line with his "common practice," because he "didn't want to mess up anything they may have been doing" regarding Canada or his residence. J.A. 128. However, Holmes did not inquire about any active JADE investigations involving Johnson, who also resided in the home Holmes intended to search.

6

cause to search.  J.A. 100.[4]  Holmes testified that he had never before obtained a search warrant to search for a suspension notice, and he was unaware of any other officer in the department who had done so.  According to Holmes, he had only recently learned about the use of search warrants in suspended license cases from another officer, Detective Schenk, who learned of the tactic during a police training session on gangs.

The warrant directed officers to "forthwith search" Appellants' residence, "either in day or night."  J.A. 43.  Holmes waited five days before executing the warrant.  Then,

---

[4] In this case, the evidence of possible other, non-traffic-related crimes that Holmes apparently thought he might find at Appellants' residence was related to narcotics:

> Q:  You had found out that using a search warrant in a traffic matter was a useful investigative tool, hadn't you?
>
> A:  Yes, sir.
>
> Q:  And that tool was useful beyond the fact of the actual traffic ticket.
>
> A:  It's an investigative tool.  Yes, sir.
>
> . . .
>
> Q:  You knew if you went to the house with this search warrant and you found drugs, you could arrest him for the possession of drugs.
>
> . . .
>
> A:  [Y]es, if you find drugs in an apartment while you're searching for something else that you're legally there to search for, then you can begin an investigation into drugs.

J.A. 100–101; *see also id.* at 112 ("Q:  You were really there looking for narcotics.  A:  I was there looking for a DMV notification . . . . I wouldn't have been surprised if I found drugs; but I was looking, searching for a DMV notification form.").

7

on a Friday night at 11:19 PM, Holmes and two other officers arrived at Appellants' home and conducted the search, ostensibly for the one-page license suspension notification. They found nothing.

2.

*Rodney Hubbard and Savannah Hubbard*

On September 11, 2015, Appellant Rodney Hubbard and his mother, Appellant Savannah Hubbard, were driving north on Route 29 and entered Albemarle County. Hubbard slowed down when he passed Holmes, who was standing outside his patrol car. A mile or two later, Hubbard noticed Holmes in his patrol car following behind Hubbard. This continued for three to four miles, until Holmes passed Hubbard. After another mile or two, Hubbard again noticed Holmes following him in his patrol car. At that point, Holmes pulled Hubbard over. Holmes claimed he stopped Hubbard because he had driven 65 mph in a 60 mph zone, but Hubbard denied he was speeding.

Holmes asked Hubbard for his license and registration, but Hubbard did not have his license with him and gave Holmes an identification card instead. Holmes then asked Hubbard to step out of the vehicle and asked him whether Hubbard's license was suspended in Virginia. Hubbard said he was unsure, but that his license in Maryland was expired. Holmes learned later during the stop that Hubbard's Virginia license was, in fact, suspended.

Holmes claimed he smelled marijuana and asked Hubbard why the vehicle smelled like marijuana. Hubbard denied that the vehicle smelled like marijuana and said there was no marijuana in the car, but he admitted that someone had smoked in the

vehicle three or four days before the stop. Hubbard stated he had placed an air freshener in his car to conceal the marijuana smell from his mother. In her deposition, Savannah Hubbard denied smelling marijuana.

Holmes told Hubbard he was not under arrest. Nevertheless, Hubbard was handcuffed, searched, and placed in the back of Holmes's patrol car due to the alleged marijuana Holmes claimed he smelled in Hubbard's vehicle. Savannah Hubbard, who was 75 years old,[5] was also searched and placed in another patrol car, and Hubbard's car was searched. No drugs were found in the car. Holmes issued Hubbard a summons for driving with a suspended license.

## B.

### *Appellants' Proffered Statistical Evidence*

Pursuant to Appellants' discovery request, Albemarle County generated the statistical evidence at issue in this case, which is located at J.A. 74, 75, 76, 77, and 78.[6] Although the parties dispute what conclusions are to be drawn from these statistics, a general discussion of the charts created by the county is necessary at the outset.

### 1.

The chart at J.A. 75 depicts the general demographic data of Albemarle County as of 2016, as well as the demographic data of the specific sectors of the county that Holmes

---

[5] Savannah Hubbard's age is not in the record, but during oral argument, Appellants' counsel noted that she was 75.

[6] For reference, these pages of the J.A. are attached to this opinion.

patrolled most often. Overall in Albemarle County, 80.66% of the population is white, and just 9.69% of the population is black. Holmes usually patrolled Sector 1 or 2. J.A. 75 shows that 68.04% of the population of Sectors 1 and 2 is white, while 18.21% is black.

2.

J.A. 74 depicts the number of Holmes's traffic stops and summonses for the years 2009 to 2015. In this timeframe, Holmes conducted 1,205 traffic stops and issued 655 summonses. For these 655 summonses, J.A. 74 also includes a breakdown of the summonses issued per year sorted by the race of the driver receiving the summons.[7] Per the charts provided by Albemarle County, in 2015, Holmes issued 92 summonses. Of these 92, he issued 47 summonses, or 51.08%, to black individuals and 44 summonses, or 47.82% to white individuals. Out of the 655 summonses that Holmes issued from 2009 to 2015, he issued 305 summonses, or 46.56%, to black individuals and 348 summonses, or 53.13%, to white individuals.

3.

J.A. 76 is titled "2015 County Traffic Statistics," and it contains a chart of all summonses issued by the Albemarle County Police Department in 2015 sorted by the race of the driver receiving the summons. Per these statistics, in 2015, officers in the

---

[7] Albemarle County tracks the number of traffic stops an officer conducts, but it does not record the race of the stopped driver if no summons was issued. Accordingly, data based on a driver's race is only available for actual traffic summonses, not stops.

10

department issued a total of 8,219 summonses. Of those summonses, 6,626, or 80.6%, were issued to white drivers, and 1,412, or 17.2%, were issued to black drivers.

4.

J.A. 77 lists all officers other than Holmes who patrolled Sectors 1 and 2, along with the number of summonses[8] each officer issued in 2015 sorted by the race of the person receiving the summons. In total, the other officers on the force who worked the same sectors as Holmes[9] issued 285 summonses. Of these, 210 summonses, or 73.68%,

---

[8] Of the statistics generated by Albemarle County, J.A. 77 is the only page that references "citations" rather than "summonses." Although these terms are not defined in the record, all parties agreed during oral argument that "citations" and "summonses" are synonymous and can be used interchangeably to mean "writing a ticket." *See* Oral Argument at 3:38–4:03, *Johnson v. Holmes*, No. 18-1454 (4th Cir. May 7, 2019), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (hereinafter "Oral Argument") ("Court: 'Are summonses and citations the same thing?' Appellants' Counsel: 'I believe so. . . . As far as I know, they are. But there's nothing in the record to indicate that.'"); *see also id.* at 18:25–36 ("Appellee's Counsel: 'I think that summonses and citations are . . . two different words for the same thing. . . . Basically, that's writing a ticket.'"). For the purposes of this opinion, we will use the term "summonses."

J.A. 77 is also the only page of statistics that does not reference *traffic* stops or summonses specifically. Accordingly, and as further discussed below, it is unclear whether the data in this chart reflects only traffic summonses, or if it includes non-traffic summonses issued by officers in Sectors 1 and 2.

[9] Holmes testified that he was occasionally assigned to patrol Sector 3; accordingly, the data reflected on J.A. 74 could contain summonses he issued outside of Sectors 1 or 2. Although the specific demographic data on J.A. 75 and the summonses of other officers on J.A. 77 only pertain to Sectors 1 and 2, both counsel agreed at oral argument that Sector 3 is a more rural area than Sectors 1 and 2 and contains a higher percentage of white individuals and a lower percentage of black individuals. Accordingly, Holmes's stops and summonses issued in Sector 3 cannot explain the racial disparity in Appellants' statistics.

were issued to white individuals, and 62 summonses, or 21.75%, were issued to black individuals.

## 5.

J.A. 78 is titled "Traffic Unit." Similar to J.A. 76 (which pertained to 2015), J.A. 78 contains a chart of all summonses issued by the Albemarle County Police Department in 2014 sorted by the race of the driver receiving the summons. In 2014, officers in the department issued a total of 10,250 summonses. Of those summonses, 8,315, or 81.1%, were issued to white drivers, and 1,716, or 16.7%, were issued to black drivers.

## 6.

Thus, as portrayed in J.A. 74, 75, and 77, the population of Sectors 1 and 2 is 68.04% white and 18.21% black. In 2015, Albemarle County police officers other than Holmes patrolling Sectors 1 and 2 issued 73.68% of summonses to white individuals and 21.75% to black individuals. Meanwhile, in 2015, Holmes issued 47.82% of his summonses to white individuals and 51.08% to black individuals.

## C.

### *Procedural History*

Appellants Canada and Johnson and Appellants Rodney and Savannah Hubbard each brought 42 U.S.C. § 1983 actions against Holmes, other unknown police officers, and Albemarle County. Both cases were originally assigned to Judge Glen E. Conrad of the United States District Court for the Western District of Virginia.

1.

*Canada/Johnson Case*

In the case of Appellants Canada and Johnson, Holmes and Albemarle County moved for summary judgment. Judge Conrad granted summary judgment to Albemarle County on the municipal liability claim, but denied summary judgment on Appellants' equal protection claim against Holmes. Specifically, Judge Conrad concluded that based on Appellants' proffered statistics and other evidence, a jury could reasonably infer that Holmes's stop and subsequent search of Appellants' residence "were motivated by a discriminatory purpose and had a discriminatory effect." J.A. 52.

The case was subsequently reassigned to Judge Norman K. Moon, also of the United States District Court for the Western District of Virginia, and it proceeded to trial. Holmes filed a motion in limine to exclude Appellants' statistical evidence. Judge Moon granted Holmes's motion in part, concluding that although the statistics could be admitted for the purpose of showing discriminatory intent,[10] they could not be used to

---

[10] As to discriminatory intent, Judge Moon concluded:

> Plaintiffs[] need only prove that racial animus was but one of the reasons Holmes undertook the course of action he did against them. In answering that question, the jury can take many factors into consideration, including any pattern of racially motivated actions by Holmes or any "historical background" of his actions that might reveal racial discrimination. In light of these jury considerations, the data showing Holmes'[s] comparably high arrest and citation rates of blacks is somewhat probative of his intent -- at least when combined with other evidence Plaintiffs may adduce at trial.

(Continued)

show discriminatory effect because they "lack[ed] any information about Holmes'[s] actions against similarly situated individuals of a different race." J.A. 70.

During the course of the trial, Appellants sought to introduce a portion of the trial deposition of Captain Darrell Byers of the Albemarle County Police Department, wherein Captain Byers stated that in his career as a captain and a patrol officer, he had never sought a search warrant for a suspended license case and he was unaware of any other officer in the department who had done so. Holmes objected to this testimony on the basis that without proof that Captain Byers had faced similar circumstances, it was not relevant. The district court sustained Holmes's objection, concluding that Captain Byers's testimony was insufficient to show that Holmes had deviated from normal procedure by obtaining a warrant for the suspension notice. *See* J.A. 169 ("Well, we don't know that it's a deviation. We don't know how often we have the same or similar circumstances in all these cases.").

At the close of the plaintiffs' case, Holmes moved for judgment as a matter of law. Judge Moon granted the motion in Holmes's favor, reasoning that Appellants failed to provide evidence that Holmes's conduct had a discriminatory effect, an element of Appellants' selective enforcement claim.

---

J.A. 64–65 (citations omitted). On appeal, the parties do not ask this court to disturb Judge Moon's ruling as to discriminatory intent.

2.

*Hubbard/Hubbard Case*

Appellants Rodney and Savannah Hubbard's case was also reassigned to Judge Moon. Following Judge Moon's exclusion of Appellants' statistics in the Canada/Johnson case, Holmes moved for summary judgment in the Hubbards' case on the basis that Appellants similarly could not prove discriminatory effect based on the statistics sought to be introduced in the Johnson/Canada trial. The district court granted Holmes's motion. Consistent with his decision in the Johnson/Canada trial, Judge Moon concluded Appellants' statistical evidence was insufficient to demonstrate discriminatory effect in the Hubbards' case because it lacked information on white individuals who were similarly situated to Appellants but were treated differently.

II.

We review de novo the legal question of whether Appellants' proffered statistics satisfied the standard for selective enforcement cases set out in *United States v. Hare*, 820 F.3d 93 (4th Cir. 2016) (adopting the standard in *United States v Armstrong*, 517 U.S. 456, 465 (1996), as the standard for selective enforcement cases), and we review a district court's relevancy and Federal Rule of Evidence 403 determinations for abuse of discretion. *See United States v. Hassouneh*, 199 F.3d 175, 182 (4th Cir. 2000). A trial court's evidentiary ruling will be overturned only if it is "arbitrary and irrational." *Noel v. Artson*, 641 F.3d 580, 591 (4th Cir. 2011).

III.

The Equal Protection Clause of the Fourteenth Amendment prohibits police officers from selectively enforcing laws based on race. *See Whren v. United States*, 517 U.S. 806, 813 (1996). To prevail on a selective enforcement claim, Appellants must prove that Holmes's conduct (1) was motivated by a discriminatory intent; and (2) had a discriminatory effect. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 634–35 (4th Cir. 2016). As noted above, Judge Moon ruled that Appellants' proffered statistics were admissible to prove discriminatory intent, but not discriminatory effect. On appeal, the parties dispute only the discriminatory effect element.

A.

*Appellants' Statistics*

Establishing discriminatory effect requires a plaintiff to show that similarly situated individuals of a different race were treated more favorably. *See Armstrong*, 517 U.S. at 465. A plaintiff may make this showing by (1) naming similarly situated individuals of a different race who were treated differently by law enforcement; or (2) providing statistics that address this question. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001)).

The law has repeatedly recognized that statistics can be used to prove discriminatory effect. *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding that a San Francisco ordinance banning the operation of laundries in wooden buildings

16

was discriminatorily applied to Chinese launderers where the city denied the petitions of some two hundred Chinese applicants who applied for exemption from the ordinance, but granted all but one of the eighty petitions of the non-Chinese launderers who applied); *Armstrong*, 517 U.S. at 467 (noting that the similarly situated requirement was met by the "indisputable evidence" in *Hunter v. Underwood*, 471 U.S. 222 (1985), that African Americans were 1.7 times as likely as whites to suffer disenfranchisement under the law in question).

The ultimate question presented in this case is exactly what these statistics must show in order to meet the similarly situated requirement. Holmes does not dispute the fact that as a general matter statistics can be used, but he contends that, in this case, Appellants' statistics were insufficient to demonstrate that similarly situated individuals of another race were treated differently.

1.

*Standard for Similarly Situated Using Statistics*

We have held that individuals are similarly situated when there are "no distinguishable legitimate enforcement factors that might justify making different enforcement decisions with respect to them." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (quoting *United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir. 2012)); *see also United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996). In other words, the statistics must show "similarly situated white individuals who could have been targeted for [the enforcement action] but were not." *Hare*, 820 F.3d at 99. The statistics must compare apples to apples.

17

## 2.

### *Holmes's Proposed Enforcement Factors*

According to Holmes, Appellants' proffered statistics failed to establish that other white drivers were similarly situated to Appellants because the statistics were not detailed enough to rule out possible legitimate enforcement factors that might justify making different enforcement decisions notwithstanding race.

Specifically, Holmes asserts the following faults with Appellants' statistical evidence, which he argues could constitute distinguishable legitimate enforcement factors: (1) the statistics are not (according to Holmes) limited to traffic stops and searches, but may include calls for service;[11] (2) the statistics do not include the reason a driver was pulled over; (3) the statistics do not identify individuals who were not stopped but could have been; (4) the statistics regarding summonses issued to white individuals by other officers on the force do not break down the types of offenses charged, the specific location of the offenses within Sectors 1 and 2, or specify whether the summons originated with a traffic stop or involved a search; and (5) "the statistics do not account for potential racial disparities that might result from crime-based assignments, such as if Holmes or his fellow officers were directed to focus on one type of crime or another." Appellee's Br. 11.

---

[11] A call for service is when an officer is dispatched to a certain location in response to an emergency or nonemergency police call. *See* J.A. 154 ("[A]s a patrol officer, one of my duties is to answer what I was referring to as calls for service. It's where dispatch dispatches you to a particular location to handle a call.").

Thus, according to Holmes, Appellants' statistics are insufficient because they are not detailed enough to exclude certain possible legitimate law enforcement factors that may explain the stark disparity in Holmes's rate of traffic summonses for African American individuals.

The district court agreed with Holmes, noting, "[T]he statistics do not break down citations and arrests by particular kind of crime, nor do they account for potential racial disparities that might result from crime-based assignments, such as if Holmes or his fellow officers were directed to focus on one type of crime or another." J.A. 66. The district court concluded this was fatal to Appellants' claim because "[w]ithout these types of information, the raw statistics simply don't advance the ball because they leave the jury without any indication of whether 'distinguishable legitimate enforcement factors' differentiate [Appellants] from some (as yet unidentified) non-black citizen who (by hypothesis) received different treatment." *Id.* at 66–67.

However, for the reasons explained below, none of Holmes's proposed enforcement factors -- that is, the five alleged statistical faults he raised -- prevent Appellants' statistical evidence from comparing apples to apples as a matter of law.

a.

*Proposed Factor 1: Traffic Summonses and Calls for Service*

First, Holmes makes much of his assertion that Appellants' statistics may include summonses resulting from calls for service in addition to traffic stops.

We note that nothing on the face of the statistical evidence at J.A. 74–78 suggests that the data includes calls for service, and Appellants dispute that it does.[12]  However, even if true, we fail to see how the inclusion of calls for service in Appellants' statistics could explain the racial disparity in Holmes's traffic summonses as compared to other officers working the same sectors.  As Holmes himself explained, a call for service occurs when dispatch sends an officer to a particular location to respond to a police call.

Thus, even if calls for service are included in the statistics, this would affect the statistics for all officers, not only Holmes.  Unless dispatch assigns Holmes, and no other officers, to respond to calls for service when a black individual is involved -- an absurd hypothetical that is nowhere supported in the record -- the inclusion of calls for service into Appellants' statistics could not explain the stark disparity in the number of summonses that Holmes issues to black individuals as compared to other officers.

---

[12] And, although Holmes's briefing before this court argues unequivocally that Appellants' statistical evidence was not limited to traffic summonses because it included summonses that resulted from calls for service, *see* Appellee's Br. 3 ("Appellants mistakenly refer to the statistics on summonses as representing 'traffic summonses.'"), Holmes testified at trial that *he did not know* whether the data was limited to traffic summonses.  *See* J.A. 135–36 ("Q:  So you don't think these were traffic summonses that were on this document.  A:  I don't know.  The only thing that was on that document, as I recall, when it was presented, was total summonses issued.  Again, I don't know -- again, I don't know whether they're traffic summonses or whether they include all my summonses issued.").  Meanwhile, at oral argument before this panel, Holmes's counsel seemed to acknowledge that Appellants had requested only *traffic* summonses from Albemarle County, not all summonses.  *See* Oral Argument at 33:51–57 ("[Appellants' counsel] never asked for a breakdown of the summonses as to what they were for. *It was just simply traffic summonses*." (emphasis supplied)).

20

Accordingly, this alleged fault does not prevent the statistics from meeting the similarly situated requirement.

b.

*Proposed Factors 2, 3, and 4: Details the Statistics Do Not Show*

Holmes next takes issue with the particular details of each stop and summons that are not reflected in the aggregate data. Specifically, he faults Appellants' statistical evidence for not revealing the reason each driver was stopped; whether a driver received more than one summons during the same stop; the specific types of offenses charged; the specific location of the traffic stop within the sector; or whether the encounter involved a search. Holmes also faults the statistical evidence for failing to identify individuals who were not stopped.

Significantly, Holmes does not explain how the lack of these details makes Appellants' statistics unreliable for the purpose of proving that Holmes's conduct had a discriminatory effect, or how any of these factors could explain the racial disparity in Holmes's traffic summonses. Appellants do not assert that Holmes's alleged selective enforcement of traffic laws depended on, for example, the specific type of traffic offense at issue or the exact location of the stop within a sector. As for the statistics' failure to identify individuals who were not stopped, such data is not recorded by the county -- and, indeed, would likely be *impossible* to track. How could something that was not done possibly be tracked? Further, all of the information that Holmes claims is missing with respect to his traffic summons statistics are similarly not included in the statistics for all

other officers on the force, so the statistics (at least facially) appear to compare apples to apples.

More broadly, the level of detail that Holmes seeks from Appellants' statistics is fundamentally at odds with the nature of aggregated data, which cannot include every conceivable detail about each traffic stop. Without an indication in the record that the details Holmes seeks would affect Appellants' claims, the allegedly missing information does not constitute distinguishable legitimate enforcement factors that justify excluding the statistics.

c.

*Proposed Factor 5: Accounting for Potential Crime-Based Assignments*

Finally, Holmes faults Appellants' statistics for failing to "account for potential racial disparities that might result from crime-based assignments, such as if Holmes or his fellow officers were directed to focus on one type of crime or another." Appellee's Br. 11. But there is *zero* evidence in the record, including in Holmes's own testimony, that Albemarle County police officers in fact received crime-based traffic patrol assignments. Similarly, contrary to Holmes's suggestion, there is no evidence that Holmes focused on patrolling different streets than other officers assigned to the same sector.[13]

These proposed "distinguishable legitimate enforcement factors" are not apparent on the face of Appellants' statistics, but are instead possible differences that Holmes says

---

[13] In fact, Holmes testified at trial that he patrolled the entire sector to which he was assigned: "We have an assigned sector and we'll patrol that whole sector . . . in between calls for service in that sector." J.A. 80.

*might* exist. In other words, Holmes assails the data -- *which came from his employer* and original co-defendant, Albemarle County Police Department -- for failing to affirmatively rule out his proposed enforcement factors when there is no record basis to believe such factors exist.

It is notable that Holmes is in the best position to know whether his proposed enforcement factors are true; however, even he does not claim that he *in fact* received crime-based assignments or that he *in fact* patrolled different streets than the other officers assigned to the same sectors. Holmes merely asserts that Appellants' statistics do not show whether he did or not.

Holmes's entirely speculative proposed factors do not constitute "distinguishable legitimate enforcement factors," and they cannot justify excluding Appellants' statistical evidence from proving discriminatory effect.

3.

*The Proper Meaning of Distinguishable*

By accepting Holmes's proposed enforcement factors as legitimate reasons to exclude Appellants' statistics, the district court improperly defined "distinguishable legitimate enforcement factors" too narrowly. Rather than interpreting "distinguishable" to mean an enforcement factor that was identifiable or discernable from the statistics themselves or other evidence in the record, the district court interpreted it to mean any possible differentiating feature -- even if not supported by the evidence -- between Appellants and the other drivers represented in Appellants' statistics. Such a definition would require a plaintiff's statistics to affirmatively disprove every conceivable

23

distinguishable factor that a defendant could raise. Aggregated data could never be so detailed.

Although selective enforcement and selective prosecution claims may be difficult to prove, the Supreme Court has clarified that they are not (and should not be) *impossible* to prove. *See Armstrong*, 517 U.S. at 466 ("The similarly situated requirement does not make a selective-prosecution claim impossible to prove."). Accordingly, we conclude that when a plaintiff offers statistical evidence to prove discriminatory effect in a selective enforcement case, a "distinguishable legitimate enforcement factor" is one that is identifiable on the face of the statistics or made apparent from other evidence in the record. To hold otherwise would mean interpreting the law to permit a claim (and an avenue for bringing that claim through statistics), while simultaneously making it impossible for such a claim to make it to a jury (by imposing a standard of proof that defies statistics). This cannot be right.

It is significant that Holmes may raise his proposed enforcement factors, if true, before the jury to attack Appellants' statistical evidence at trial. Conversely, requiring a plaintiff's statistics to be so detailed as to disprove any possible enforcement factor that a defendant may assert, even when there is no record evidence that any such factor exists, would mean a plaintiff's proof must be completely unassailable both factually and as a matter of law to even submit it to a jury.

Finally, Appellants could only bring this claim by relying on data received from Albemarle County. In other words, the very entity who decides what data to record is the same entity that would benefit from vague or incomplete statistics in selective

24

enforcement cases like this one. Although the burden of proving a selective enforcement claim is on the plaintiff, we cannot ignore the reality that the recordkeeping is entirely under the county's control. Defendants could evade liability by simply omitting necessary information from their records. The law should not create or allow such an incentive.

4.

*Whether Appellants' Statistics are Sufficient*

The remaining question is whether Appellants' statistics are sufficient evidence of discriminatory effect when applying the correct standard -- that is, whether the statistics or other evidence in the record reveal no distinguishable legitimate enforcement factors that justify making different enforcement decisions between Appellants and the white drivers reflected in the statistics.

At the outset, we note that Appellants' statistics avoid the pitfall of the statistics at issue in *United States v. Armstrong*, *United States v. Hare*, and *United States v. Olvis*.[14] Crucially, in each of these cases, the proffered statistics faltered because they said nothing about individuals of other races who committed the same crimes but were treated more favorably. For example, in *Armstrong*, the Supreme Court rejected the statistical evidence proffered by the criminal defendants, which was (as relevant here) a "study"

---

[14] Although *Armstrong* and *Olvis* are selective prosecution claims, they apply the same standard as selective enforcement claims. *See Hare*, 820 F.3d at 99 ("This Court has adopted *Armstrong*'s standard for proving selective prosecution as the standard for proving selective enforcement.").

25

conducted by the criminal defendants' lawyers showing that "in every one" of the Office of the Federal Public Defender's 24 cases in 1991 in which a defendant was prosecuted for conspiring to possess and distribute crack cocaine, the defendant was black. *Armstrong*, 517 U.S. at 468–69. The Court held that the study was insufficient because it addressed *only* the prosecuted black defendants and did not include evidence that similarly situated white defendants could have been prosecuted but were not. Instead, the study "presum[ed] that people of all races commit all types of crimes," a presumption that the Court determined "ha[d] no proper place in the analysis of this issue." *Id.* at 469–70 (emphasis omitted). Thus, the flaw in the proffered study in *Armstrong* was that it did not demonstrate that anyone outside of the 24 black defendants could have been prosecuted, and the Court was unwilling to assume without evidence that such individuals of other races existed.

But, significantly, Appellants' statistics are unique in this respect. Because Appellants charge one officer, Holmes, with selectively enforcing traffic laws based on race (as opposed to an entire department), Appellants can compare data about Holmes's traffic stops and summonses by race with similar data from the rest of the police force and from individual officers assigned to the same sectors as Holmes. Thus, even though Albemarle County does not (and could not) record the races of specific drivers who could have been stopped but were not, nor does it record the races of drivers who were stopped but not ticketed, the percentage of white drivers stopped and ticketed by the other officers patrolling the same locations as Holmes serves as a proxy to show the general racial composition of drivers on the road that Holmes could have pulled over but did not.

26

But this is not necessarily enough to prove Appellants' claims. As explained above, to satisfy the similarly situated requirement, there can be no distinguishable legitimate enforcement factors identifiable on the face of Appellants' statistics or made apparent from other evidence in the record that justify making different enforcement decisions between Appellants and the white drivers reflected in the statistics. In this case, we cannot conclude on the current record that no legitimate enforcement factors are identifiable on the face of the statistics, because it is not clear whether Appellants' statistics on J.A. 77, which shows the summonses issued by other officers in Sectors 1 and 2, are limited to *traffic* summonses.

We have already addressed Holmes's contention that Appellants' statistical evidence may include summonses resulting from calls for service. As we noted, this argument does not explain the racial disparity in Holmes's summonses, since any racial disparities created by calls for service would affect the other officers in Sectors 1 and 2 as well. Separate from the calls for service issue, however, Holmes more broadly attacks Appellants' statistics as not being limited to traffic stops and traffic summonses, but as including *all* summonses issued by an officer for any reason.

In response, Appellants maintain that the statistics reflect only traffic summonses. Appellants first assert that the statistics were provided by Albemarle County in response to a discovery request for *traffic* summonses. *See* Oral Argument at 3:34–38 ("All that we requested were traffic summonses and traffic stops."). Secondly, Appellants argue, "the context of the charts demonstrate that they are traffic statistics." Appellants' Reply Br. 1 n.1.

27

As to Appellants' second point, we agree that the titles and context of the charts provided by the county and proffered by Appellants on J.A. 74, 75, 76, and 78 indicate that these statistics refer to traffic stops and summonses. J.A. 74, which relates to Holmes's traffic stops and summonses issued from 2009 to 2010, contains first a chart titled "Number of Traffic Stops Conducted by Year," followed by an identically formatted chart titled "Number of Summonses Issued by Year." The number of summonses appear to be a subset of the number of traffic stops (those stops that resulted in a summons being issued), and there is nothing on the face of the statistics nor any other evidence in the record to suggest that the data includes summonses from any source other than traffic stops. J.A. 75 includes only demographic data; nevertheless, it notes: "Demographic data is not available for traffic stops unless a summons/citation is issued." The inclusion of this note on J.A. 75, which otherwise contains no data about summonses or other enforcement activities, suggests that the statistics were generated in response to a data request specific to traffic enforcement. J.A. 76 and 78, titled "2015 County Traffic Statistics" and "Traffic Unit," respectively, appear clearly tailored to traffic data and include charts related to traffic crashes, traffic fatalities, and DUI arrests.

However, J.A. 77 does not specify that the summonses contained in that chart were traffic summonses. In fact, J.A. 77 is the only chart that contains no mention of "traffic." Notably, Holmes is not included in the chart on J.A. 77, so we cannot determine the value of the statistics on this chart. Thus, it is unclear whether all of

28

Appellants' statistics compare Holmes's *traffic* summonses to the other Sector 1 and 2 officers' *traffic* summonses.[15]

This leaves us with Appellants' first point: that the statistics were provided by Albemarle County in response to Appellants' discovery request for *traffic* summonses. However, the specific language of this data request is not in the record before us, and it was apparently not in the record before the district court. As discussed at oral argument:

> COURT: What did you ask for?
>
> APPELLANTS' COUNSEL: I asked for traffic summonses.
>
> COURT: Traffic summonses?
>
> COUNSEL: Yes. In fact, I have the request here.
>
> COURT: Is the request in the record?
>
> COUNSEL: No.

Oral Argument at 4:44–55.

The question of what data is depicted in J.A. 77 arose repeatedly in oral argument, and Appellants' counsel offered to supplement the record with Appellants' original data request to show specifically what Appellants asked the county for:

> COURT: What we don't know is what you asked for. You've made a representation to us about what you asked for. Both [counsel] told us, I think, that those discovery requests are not in the record, and the responses to them are not in the

---

[15] If further fact-finding reveals that the data underlying J.A. 77 is not limited to traffic summonses, whether this is a distinguishable legitimate enforcement factor precluding Appellants' statistics from satisfying the similarly situated requirement is a question for the district court to resolve in the first instance. We express no opinion on this matter.

record . . . . It was also suggested . . . that you all could move to supplement the record. You haven't done that yet, right?

APPELLANTS' COUNSEL: But it's not too late, I hope.

COURT: You're never going to know unless you make a motion, will you?

Oral Argument at 37:06–41.

But Appellants' subsequent motion to supplement did not include Appellants' original data request to the county, but instead contained only the raw data used to compile the chart in J.A. 74. Thus, Appellants have so far been unable to support their assertion that they specifically requested traffic summonses from Albemarle County.

Accordingly, this court is unable to decipher on this record whether Appellants' statistics satisfy the similarly situated requirement as a matter of law. Therefore, we reverse the district court's ruling excluding Appellants' statistics from trial for the purpose of proving discriminatory effect, and remand to the district court for further fact-finding and analysis per the correct standard explained in this opinion.[16]

Specifically, the question for the district court is whether there are distinguishable legitimate enforcement factors apparent from the face of the statistics themselves or other record evidence that justify making different enforcement decisions between Appellants and the white drivers reflected in the statistics, bearing in mind the unique power imbalances inherent in selective enforcement cases when plaintiffs are forced to rely on

---

[16] In light of this remand, we accordingly dismiss as moot Appellants' Motions to Supplement, ECF Nos. 45 and 48.

30

the police department's statistics to prove their claim. If Appellants show that they asked for traffic stops and traffic summonses, they may rely on the information the county provides about its own officers in response to that request. Thus, in that case, the district court may safely presume J.A. 77 -- and the remaining statistical evidence created by the county -- reflects traffic summonses.

B.

*Captain Byers's Testimony*

Appellants also assert that the district court erred in excluding deposition testimony by Captain Byers of the Albemarle County Police Department that he had never sought a search warrant to look for a license suspension notice, nor was he aware of any other officer who had done so. The district court ruled this evidence inadmissible because Captain Byers's statement did not establish that he had confronted similar circumstances as Holmes's stop and subsequent citation of Appellant Canada -- that is, Captain Byers's testimony did not state that he had issued a suspended license ticket to a driver who denied receiving a suspension notice in the mail.

It strikes us that Captain Byers's testimony could serve as evidence that Holmes deviated from standard procedure in applying for a search warrant for the suspension notice, which a jury may consider as evidence of discriminatory intent, if Captain Byers testified that he has, in fact, faced similar circumstances as Holmes but chose not to apply for a search warrant for a suspension notice. However, in the absence of such testimony, we cannot conclude that the district court's evidentiary ruling was "arbitrary and

31

irrational." *Noel v. Artson*, 641 F.3d 580, 591 (4th Cir. 2011). Accordingly, the district court did not abuse its discretion by excluding the evidence.

IV.

For these reasons, we affirm the district court's evidentiary ruling regarding Captain Byers's testimony. However, the district court erred in applying an improperly narrow definition of "similarly situated." Therefore, we reverse the district court's ruling excluding Appellants' statistical evidence proffered to prove discriminatory effect. Because the record before us is insufficient for this court to determine whether the proffered statistics establish Appellants' claims as a matter of law, we remand to the district court for further fact finding consistent with the proper standard described herein.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*